UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Petitioner, | : | |
| | : | |
| v. | : | Misc. Action No. 13-341 (ABJ/JMF) |
| | : | |
| THE SALVATION ARMY SOUTHERN TERRITORY AND THE SALVATION ARMY, | : : : | |
| | : | |
| Respondents. | : | |

## MEMORANDUM OPINION

This case was referred to me by Judge Amy Jackson for full case management. Currently pending and ready for resolution is the United States of America's Petition to Enforce Subpoena Issued by the United States Department of Housing and Urban Development [#1]. For the reasons described below, the petition will be granted, subject to certain conditions.

## BACKGROUND

In 2012, the U.S. Department of Housing and Urban Development ("HUD") initiated an investigation of the Salvation Army, based on an administrative complaint alleging that the Salvation Army "discriminated against pregnant women because of their familial status and sex and men because of their sex in violation of the Fair Housing Act." [#1] at 3. In particular, the administrative complaint charges that a particular transitional housing program run by the Salvation Army, the Turning Point Center for Women and Children, terminated certain women from the program once they became pregnant. Id.

The Turning Point Center for Women and Children is a "transitional living facility" that "helps its participants break the cycle of chronic homelessness and joblessness." Memorandum of Law in Opposition to the United States' Petition to Enforce Subpoena [#7] at 3. Like all

Salvation Army programs, the Turning Point Center follows the Salvation Army's "Policy and Guidelines on Confidentiality and the Protection of Personal Privacy." Id. at 4.  The Salvation Army acknowledges that it terminated four women from the Turning Point Center program once they became pregnant, as "pregnancy is a grounds for dismissal from the program as a matter of program policy." Id. at 7.

As part of HUD's authority to investigate housing discrimination, conferred by Title VIII of the Civil Rights Act of 1968 and the Fair Housing Amendments Act of 1988, HUD issued subpoenas to the Salvation Army seeking information relevant to its investigation. [#1] at 3.  In that subpoena, HUD requested copies of resident files for the women terminated from the housing program. Id.  The Salvation Army provided the resident files, but redacted all personal identifying information, claiming that its national confidentiality policy "precluded it from disclosing the identities of program participants without consent of the residents, or a court order compelling such disclosure." Id.  The Salvation Army did make some effort to contact the women at issue to obtain their consent, but this was unsuccessful. Id. at 4.

On August 30, 2012, HUD served the Salvation Army with the subpoena at issue here. Id. The Salvation Army responded once again that complying with the subpoena would violate the Salvation Army's internal policies regarding confidentiality and the privacy of program participants. Id. at 5.  HUD then filed the instant action, seeking enforcement of the subpoena.

## LEGAL STANDARD

It is well established that the court's role in a proceeding to enforce an administrative proceeding is "a strictly limited one." FTC v. Texaco, 555 F.2d 862, 871-72 (D.C. Cir. 1977). Under Supreme Court precedent, "so long as the investigation [is] for a lawfully authorized purpose, the documents sought [are] relevant to the inquiry, and the demand [is] reasonable," the

subpoena should be enforced. Id. at 872 (citing Oklahoma Press Publ'g Co. v. Walling, 327 U.S. 186, 216 (1946)); see also United States v. Morton Salt Co., 338 U.S. 632, 652 (1950) ("[I]t is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant.").

## ANALYSIS

The Salvation Army objects to HUD's petition on three grounds: 1) that HUD is already in possession of the documents it seeks; 2) that the personal identifying information of the women who were terminated from the Turning Point Center is not relevant to HUD's investigation; and 3) that an independent review is necessary here because the subpoena implicates First Amendment concerns. [#7] at 6-9.

**I.      HUD is Not Already in Possession of the Documents it Seeks**

The Salvation Army's first argument is without merit. HUD concedes that it has received the resident files for the women in question, but indicates that all identifying information was redacted. HUD is seeking the un-redacted versions of those files. Thus, HUD is not seeking to compel production of documents already in its possession.

**II.     The Personal Identifying Information is Relevant to HUD's Investigation**

The Salvation Army's second argument is equally unpersuasive. HUD asserts that the identification of the women is "relevant and necessary" for its investigation because those women may have information about the Salvation Army's policies, or may know other individuals who were "victims of these allegedly discriminatory housing practices." Memorandum of Points and Authorities in Support of Petition to Enforce Subpoena Issued by the United States Department of Housing and Urban Development [#1] at 12. HUD elaborated on this in its reply brief, noting that the identities of the women would allow HUD to:

3

> (1) inform the women of their fair housing rights, including that they may be aggrieved persons under the Fair Housing Act entitled to remedies for any violation; (2) interview them in order to locate other witnesses and victims of the alleged discrimination; (3) interview them as to The Salvation Army's policies and practices; (4) ascertain whether and, if so, to what extent the women were injured by The Salvation Army's policies and practices; and (5) if they were injured . . . assess their individual damages.

Reply Memorandum in Further Support of Petition to Enforce Subpoena Issued by the United States Department of Housing and Urban Development [#8] at 4.

Although the Salvation Army has already conceded that it has a practice of terminating women from the Turning Point Center if they become pregnant, HUD has identified numerous other ways in which the identities of the women would be useful to its investigation.

HUD's rationales, noted above, are not "plainly incompetent or irrelevant to any lawful purpose [of the Agency]." FTC v. Bisaro, 757 F. Supp. 2d 1, 6 (D.D.C. 2010). It is not for this Court to direct the scope or direction of an agency's investigation, so long the information requested is reasonably relevant to an investigation that falls within the agency's purview.

### III.     The Salvation Army's Right to Freedom of Association Under the First Amendment is Not Grounds for Non-Disclosure

Finally, the Salvation Army encourages this Court to conduct an "independent review" of the HUD subpoena using "more exacting scrutiny" because ordering disclosure of the identities of the women at issue would "implicate[] [F]irst [A]mendment concerns." [#7] at 8. In support of its argument, the Salvation Army points to Salvation Army v. Department of Community Affairs of New Jersey, 919 F.2d 183 (3d Cir. 1990).

In Salvation Army, the court of appeals held that the Salvation Army might have a valid First Amendment interest in keeping the identities of "beneficiaries" of a residential adult rehabilitation center confidential. Id. at 201. In particular, the court held that "forced disclosure may chill individuals from associating" with the Salvation Army and participating in its

programs. Id.  The court was also careful to note, however, that the state may have a compelling interest in obtaining the identities of current program participants. Id.  Ultimately, the court remanded the case to the district court to hear evidence on 1) whether disclosure of the participants' identities would, in fact, discourage continued participation; and 2) whether the reporting requirement set by the state was narrowly tailored to a compelling state interest. Id.

While the members of the Salvation Army have a First Amendment right to associate with each other to advance political, theological or social concerns, and its confidentiality policy was established to specifically protect the privacy of individuals already enrolled in its programs, as well as to encourage new members, it would be difficult for the Salvation Army to show that prospective female members would be deterred from joining because of the governmental action proposed in this case.  The logic would have to be as follows: a potential participant would elect *not* to enroll in the Turning Point Center if she knew that 1) if she got pregnant she would be terminated from the program; 2) if she was terminated from the program, the government might investigate whether that termination violated the Fair Housing Act; and 3) if the government conducted that investigation, her personal identifying information would be revealed.

Such a speculative, fanciful, and logically attenuated chain of supposed consequences cannot defeat a governmental investigation into whether the rights of the expelled women were violated.  Indeed, under that logic, the Salvation Army could avoid full investigation for violations of the civil rights laws because of an internal policy that prohibits the disclosure of the names of the very persons whose rights the Salvation Army may itself have violated.  This is quite different than the situation at play in the Third Circuit case cited by the respondents, where the state sought identifying information for individuals *currently* enrolled in the Salvation Army program.

Furthermore, even if the Salvation Army were able to make out a convincing argument that the subpoena impinges on its First Amendment right of free association, there is a compelling governmental interest in eliminating housing discrimination on the basis of familial status and gender.  HUD has met its burden of showing that the identities of the women are necessary to fully investigate the impact of the Salvation Army's policies on the pregnant women the Salvation Army discharged from the Turning Point Center.

Finally, the Salvation Army's privacy concerns are especially misplaced here, where HUD offered "to treat the identities of the four women as confidential during the course of the investigation" in several specific ways: "(1) have Respondents designate with a stamp the word 'confidential' on any document, information or material identifying the participants if such document, information or material is of a private sensitive or personal nature and Respondents have a good-faith basis in fact and law for so designating the material; (2) hold in strict confidence and keep securely information or material designated as 'confidential'; (3) limit access to necessary HUD personnel to all documents, information or materials stamped 'confidential' as well as to written or oral summaries or accounts thereof; (4) only make the number of copies of confidential information or material reasonably necessary to conduct the investigation; and (5) endeavor to pursue a stipulated protective order regarding the exchange of confidential information if a Charge of Discrimination is issued in this matter, and no party elects to have the case heard in federal court." [#8] at 11-12.  I believe these conditions are adequate to address any legitimate privacy concerns, and I will order that they be followed once the Salvation Army complies with the subpoena.

## CONCLUSION

HUD has met its burden of proving 1) that its investigation is for a lawfully authorized purpose; 2) that the information requested is relevant to its inquiry; and 3) that the demand is reasonable.  The three arguments proffered by the Salvation Army opposition to HUD's motion are not persuasive.

An Order accompanies this Memorandum Opinion.

_____
JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE